Council, whenever you're ready to make a statement. Do I have the wrong case? What case are you here on? No, this is the appellate. Oh, go ahead. Go ahead. Thank you. Good morning, Your Honor. Thank you very much for allowing us to appear here. This case involves a citation of covered assets filed by Amy Hammond, the Special Administrator of the Estate of Elaine Clay Mitchell. We feel that the trial court was in error when the trial court denied the prayer of her petition to recover assets that are in the possession of Mary Edward Mitchell, the Executive of the Estate of Elaine Clay Mitchell, and also Clay Mitchell's son. We feel that the trial court failed to focus on two relevant time periods. Clay Mitchell was a patient in Doctors Hospital in Springfield, Illinois, in the Center for Mood Disorders, which is the psychiatric unit of that hospital. He was a patient there from late March of 1997 until May 8th of 1997. On April 10th, while a patient in that hospital, in the psychiatric unit, he signed powers of attorney for property and for health care. We feel that is one of the relevant time periods that the trial court failed to focus on. The trial court also failed to focus on the time period of January of 2002. During that month, Mary Edward Mitchell essentially came into control of the possession of the liquid assets of his late father, Clay Mitchell. Of course, he wasn't deceased at the time. It should be noted from the testimony that Ed Mitchell testified that he never recalled his father ever having given him anything during his lifetime. January of 2002 is significant for another reason. Not only that, but the various assets moved from the possession of Clay Mitchell's name alone to Mary Edward Mitchell and others. The trial court, the evidence deposition of Dr. Narender Arora was presented. If I may, I'd like to go back to the April 10th, 1997 power of attorney. The psychiatrist Clyde Mitchell testified that during the time that Clyde Mitchell was a patient in the psychiatric unit, that he would not have been able to care for his possessions, his belongings, and make relevant decisions with regard to those. And also, that on April 10th, 1997, when Clyde Mitchell signed the power of attorney for property, that Clyde Mitchell was too impaired to have understood the significance of signing it. The trial court failed to focus on that period. The other evidence presented at the trial court on behalf of the special administrator was the evidence deposition of Dr. Arora, a family physician, who testified that in January of 2002, Clyde Mitchell was on a no-code status, which means essentially that if his heart would stop or he were to cease breathing, the medical care providers would not use artificial means such as a pacemaker or ventilator to resuscitate him. So basically, they had written him off as a near-returner. That same month, Clyde was released from the hospital on January 17th, and that same day, Marion Edward Mitchell used the power of attorney that had been signed in 1997 to go to the bank in Newton, Illinois, and change the bank account ownership from Clyde Mitchell individually to Clyde Mitchell and Marion Edward Mitchell as joint tenants with survivors. At that time, Ed Mitchell was already a permitted signer on those bank accounts. Also during this period of time, in January of 2002, Ed Mitchell brought to the nursing home where Clyde was staying after he had been released from the hospital, a stock certificate for capital stock in the People's State Bank, which Clyde then signed over to Ed while he was in the nursing home. Also during January of 2002, Ed Mitchell prepared a document titled something to the effect of a designation of retitling of certificates of deposit. Clyde Mitchell had approximately 35 5,000-dollar certificates of deposit. A few were his name, a joint tenancy with his son, and a few were joint tenancy in his name with his other son, Ken. And about 32 of that were his property, either as being in his name alone, or in the name of his late wife, from whom he would have inherited it. The document that Clyde Mitchell signed in January of 2002 was to retitle these certificates of deposit in a joint tenancy between Clyde Mitchell and Clyde Mitchell's grandchildren, and some, again, in the names of additional ones, in the names of Ed and his brother Ken. It's the position of the appellant that when all these transactions took place, Clyde was impaired, according to the testimony of his family physician, Dr. O'Rourke, who testified, among other things, that Clyde Mitchell was confused. He was suffering from Alzheimer's and manic-depressive psychosis, and he was unable to do anything in January of 2002 when all these transactions took place. Now, we raise as a second issue the fact that because Ed Mitchell was the attorney-in-fact for Clyde Mitchell, he had a fiduciary duty to not take advantage of his father. As I said earlier, his father had never given him anything before, and as a result of the power of attorney and the various transactions in January of 2002, Mary Edward Mitchell came into control of the assets of his father, thereby benefiting from his position as agent for Clyde Mitchell. That raises a presumption of a fraudulent transaction, and, of course, that was all argued to the trial court, right? Yes. And, in other words, I guess it was argued that the burden was then on him to, on the fiduciary, to show that it was, in fact, a fair transaction. Yes, sir. And the trial court ruled it was. Well, I think the trial court did rule that way, but I think the trial court didn't focus on the testimony of Dr. O'Rourke in the form of his evidence deposition. Okay, it's not a question of what the trial court focused on. At this point, your argument has to be that the trial court's determination is against the manifest way to the evidence. Yes, sir. In other words, that the opposite conclusion is apparent. Yes, sir. Okay. And we're saying that the testimony of his position, who is unbiased, created support of the argument that the transactions were fraudulent, when his position said that Clyde Mitchell so and so couldn't do anything. Now, the evidence presented by Ed Mitchell, the son, was in the form of testimony by his brother, who was not present in 1997 when the car was returned to the site, nor was his brother present when the transactions took place that resulted in Ed Mitchell acquiring these assets. The other testimony presented was the good friend of Ed Mitchell, Ray Dial, with whom Ed shared an office. This was the totality of the evidence presented in support of the contention that this transaction was fraudulent. And we believe and represent that the manifest way of the evidence should find that the unbiased testimony of Clyde Mitchell's personal position, as to his mental condition, should override, if things were on equal footing, the testimony of Mr. Dial. Also, there is some testimony presented by Ed Mitchell himself as to what happened. And I think that the case of Enrique Dejarnet, which is cited in our brief, establishes that the unsupported testimony of the domain, although it's not sufficient to overcome the burden imposed upon him to show that the transaction was fraudulent. So, we feel that the trial court was in error in finding that the agent met his burden of proofing by clear and convincing evidence that the transactions were fraudulent. Finally, or nearly finally, we feel that the power of attorney did not authorize Mary Ann Marie Mitchell to undertake the actions she took. The power of attorney does not allow for Ed Mitchell to change the ownership of the assets of Clyde Mitchell. But using the power of attorney, it did that. We feel that he went beyond the scope and the parameters of that power of attorney. And therefore, those transactions have to be set aside, because he was without authority to actually do those things. And we also would ask the court, if the court rules in favor of the appellate, to impose the costs, attorney fees, and special minister's fees upon Mr. Mitchell, Ed Mitchell personally. Because he is the individual who determined that this matter should proceed to trial, and in his attempt to retain the assets that we think the law clearly shows he's not intending to retain. So we humbly ask this court to reverse the decision of the trial court and hold that the assets that Ed Mitchell has in his possession, that were the subject of the citation to cover assets, that those assets be ordered to be restored to the appropriate state of Clyde Mitchell, and that the costs be assessed against the attorney fees be assessed against Ed Mitchell personally. Thank you very much. Thank you, counsel. Counsel? Thank you, Mayor. Please, the court. There is also a motion to strike the appellate's brief in this case. The statement of facts consists of about one typed page in the appellate's brief. It cites the record for the death, the date of death of the decedent, his wife, his son, and the fact that Ed Mitchell is the executor of the statement. That's it.  Now, the court has to understand the scenario. The appellant's original brief was filed. We filed a motion to strike the brief for failure to comply with the rules and specifically cite that. The court granted that motion, struck the brief, but before that evidence was ordered, the appellate's brief was due and filed, and it contained citations to the record in the statement of facts, and then the amended brief of the appellant was filed, and it has exactly the same shortcomings. The court gave the appellant a second chance to comply with the rules, and they didn't bother to do it. The conclusion, as we pointed out in our motion, was on eight pages, and you can't tell from the conclusion what it is that the appellant really wants you to do. As we hear counsel suggesting now, he told you an argument that there were some certificates of deposit that were joint between my client and his father, his brother and the father, and the wife and the father, and when the wife died, those were transferred to the grandchildren, not to Ed, but he wants Ed to put those back in the estate, but there's nothing in the record or in the statement of facts that supports any of what he says in this brief. If we don't have rules, if we don't have to follow the rules, then maybe we should eliminate the requirement of a statement of facts, but the rules call for it, and there should be some consequence of failing to comply with the rules. We think that under the circumstances of this case, the court should strike the appellant's brief and simply dismiss the appeal. If you don't, counsel never wants to mention the anti-lab statute. This court could resolve this whole case by ruling that the special administrator simply doesn't have any standing in this case. She is excluded in the Irresiduality Clause by the plain language of the will. The will has three other class gifts, as I call them. In each and every one of those class gifts, the will provides that the takers should be my sons who are living and the heirs of those who have died. But in the residuary, the gift is only to those sons of mine who are living. And it is clear that the – Does it say mine who are living? It just says to my children. Yeah. In fact, it doesn't say – Right. To be a little more clear. It would be more clear. But the drafter of that instrument did exactly what he was supposed to do. He showed you that he did not forget the possibility that one of his children would pre-decease to testify. And if you say, okay, the anti-lab statute doesn't apply, then these plaintiffs, these appellants, simply don't have any standing, and it doesn't matter. And finally, you have to reach the issue of is the trial court's decision against the manifest way to the evidence. Counsel seems to hang his entire argument on one or two lines from the evidence deposition. But the court had the entire evidence deposition, and he says we ought to poo-poo the testimony of Ray Dial, which the trial court made a specific finding that he found Ray Dial to be extremely credible. I don't know – I've never seen a case where in the face of that kind of finding, the appellate court says, ah, the trial judge is wrong. That witness didn't mean a thing. In regard to the psychiatrist, he said his condition waxed and waned. I can't tell if he was competent at the time he signed the power of attorney or not because I wasn't there. But we know one thing. We know that the power of attorney was witnessed by three nurses at the facility, and the doctor said in his deposition that if he had been incompetent, those nurses would have been under understanding not to witness a power of attorney for someone who was clearly incompetent. And we relied on that power of attorney as being valid in terms of the medical care that we gave this patient. So he may not have been competent when I saw him, but certainly three nurses thought that he was, and they thought that power of attorney was valid enough to provide him medical care for a period of three months. In addition, the doctor said he got better. We let him go. He was out of the hospital for five years between 1997 and 2002, and in no time did he ever make any effort to undo or change any of these accounts that Ed had helped him with. He was conducting his own business, writing checks, and counsel suggests to you that the fact that he was on a no code means he didn't want to take further life measures, means that he's incompetent. There's no correlation between not wanting exterminary life-saving measures and whether you're competent to give your son property. He says there had never been any gifts. But that's contrary to what the trial court found. Here he is when he's given these gifts, the grand gifts, the CDs. Remember what Mr. Thomas said? There were already some jointly with one son and jointly with another. The trial judge made a finding and saw on the record. He said, it looks to me like Mr. Mitchell is just doing what he had been doing all along, making provisions for when he died he would either go to his wife or one son or another, and now the wife's gone, and he continued that path. There is nothing that counsel points to that says that the trial court misweighed the evidence. It is a way. You have to consider the cross-examination of the witness as well as the drug. You can't pick two lines out of an evidence deposition and say this solves the whole thing when you're talking about whether these transactions were fair. And when the trial court makes the express finding that Mr. Mitchell met the burden of proof by clear and convincing evidence, you have to then, in order to reach a contrary conclusion, you have to go back and reweigh all of the evidence, and that's simply not the function of the court. That's not what the court is supposed to do. Counsel doesn't point to any errors that were made in terms of the admissibility of evidence. He simply says we don't, you shouldn't consider what Ed said, you shouldn't consider what Ray said, and you shouldn't consider the totality of the doctor's depositions. The doctor even said the people who are going to be in the best position to know whether or not Mr. Mitchell was incompetent were the people that are around him, and those were the people that testified. Ray Dial was in contact with Mr. Mitchell on almost a daily basis. They would speak when they were downtown, they would come to Mr. Dial's office, and he was at the nursing home. Ed was there. The court found it significant that Ken testified because his testimony was contrary to his own economic interests. He's a Ph.D. in nuclear physics, and he testified in favor of his brother, the executor. And when the court concluded that testimony, and it weighed all of the evidence, not just two lines from two depositions, he concluded that by clear and convincing evidence, Ed Mitchell had shown that what had happened was the same pattern, what the testator had wanted, and that no undue influence had been exercised over Clyde Mitchell. In fact, the almost unanimous opinion was that Clyde Mitchell was a strong-willed individual. As a matter of fact, when asked that question, Ray Dial almost laughed. He said, was Clyde strong-willed? He laughed and said something, in fact, almost as strong-willed as anybody I've ever known, that no one would do against Clyde or for Clyde what he didn't want done. And when the court finds that Ray Dial is a particularly important witness and gives his testimony in a great way and then the appellant asks him to simply ignore that and decide that the trial court abused the manifest way of the evidence based on two lines and two evidence depositions, I don't believe that that's the function of the court and that's grounds to reverse the trial court in this case. So we're asking in the first instance that the court strike the appellant's agreement and simply dismiss the appeal. The alternative, we're asking that the anti-lapse statute be ruled to apply and that the appellant's only understanding or alternatively simply affirm the trial court on the grounds that there is not a showing that his decision was against the manifest way of the evidence. Thank you, counsel. Counsel? Thank you. The appellant represents that the amended brief substantially complies with the Supreme Court rules and that the brief shouldn't be struck and the appeal dismissed. We talked about the power of attorney being witnessed. The witnesses, they may, it's not like a will where they make a declaration that we believe the person that signed this document is of sound mind and merit. They simply say, we saw him sign it. Now, were any of these nurses called as witnesses in this case? No. The evidence deposition of Dr. Alexander was taken two years before the trial in this case. And those nurses, if they believe or support the position that's now being represented, they should have been called as witnesses in the trial court, but they weren't. I guess the other side of that is if they would have said that he was not competent, you'd think you would have called him. Well, Your Honor, I disagree because the power of attorney for health care does not say that the witnesses may render any opinion concerning the mental state of the person that signed it. They said, where is the fact that the person that signed the power of attorney signed it? Okay, are you wanting us to draw an inference, though, that the other side should have called him? Otherwise, they would have said that he didn't know what he was doing? What I'm saying, Your Honor, is that the psychiatrist said that he was impaired and that evidence deposition of the psychiatrist was taken two years before the trial and that the employee, Mr. Mitchell, had ample opportunity to call these people to refute what the doctor said. But they didn't. And with regard to the anti-lab statute, it's my understanding that the anti-lab statute requires the testator to clearly manifest an intent to exclude for simplification of grand jury. And this court didn't. And we also would point out that the testimony of Ken Mitchell, his brother, he would have a motivation to support his position to maintain the family good name. Because in essence, we're claiming that Ken's brother, Ed Braunfleet, took a copy from his physically and mentally impaired father. It's also true that Clyde Mitchell could have been very strong-willed earlier in life. But this is, like, 18 months before he died. He was on a no-hold status. His own physician said he was confused and couldn't do anything. And the person, 90 years old, is not the same person who was 50. And we represent that the important time frame is what was Clyde Mitchell like in January of 2002, not what had he been like sometime in the past. So we ask this court once again to reverse the decision of the trial court, order Mr. Ed Mitchell to restore to his father's estate the property that rightfully belongs to the estate. Thank you. Thank you, counsel. We appreciate the briefs. And I urge Mr. Counsel to take the case under advisement.